AO 106 (Rev. 01/09)  Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

Central District of Illinois

FILED

APR 23 2019

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>See Attachment A, which is attached hereto and<br>specifically incorporated herein by reference<br>Facebook User ID "Joe Morris" | )<br>)<br>)<br>)  Case No.  19-MJ- 7083<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe property to be searched and give its location):*

See Attachment A, which is attached hereto and specifically incorporated herein by reference.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*

See Attachment B, which is attached hereto and specifically incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of _____ U.S.C. § _____ , and the application is based on these facts:  See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

s/Joel Smith

_____
*Applicant's signature*

Joel C. Smith, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

s/Eric Long

Date:  4/23/2019

_____
*Judge's signature*

City and state:  Urbana, Illinois

ERIC I. LONG, United States Magistrate Judge
*Printed name and title*

## A F F I D A V I T

I, Joel C. Smith, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since March 2016. I am currently assigned to the Springfield, Illinois Division. My duties with the FBI include investigating criminal violations of the United States Code, including violent crimes, domestic terrorism, and bombings within the United States. I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state and federal law enforcement agencies. I have participated in the execution of warrants to search and seize electronic devices, such as cellular telephones and computers, as well as other Facebook accounts.

3.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal offenses. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1951 and 2 (Conspiracy to Interfere with Commerce by Threats and Violence); 18 U.S.C. §§ 922 (o) and 924 (a)(2) (Unlawful Possession of a Machine Gun); 18 U.S.C. §§ 844(i) and 2 (Attempted Arson); 18 U.S.C. § 922(g)(1) (Possession of a Firearm by a Felon); 18 U.S.C. §§ 247(a) (1) and 2 (Intentionally Defacing, Damaging and Destroying any Religious Real Property Because of the Religious Character of that Property); 18 U.S.C. §§ 247(a)(2) and 2 (Intentionally Obstructing, and Attempting to Obstruct, by Force and the Threat of Force, the Free Exercise of Religious Beliefs); 18 U.S.C. §§ 844(h) and 844(m) (Conspiracy to Commit Federal Felonies by Means of Fire and Explosives); 18 U.S.C. §§ 924(c)(1)(B)(2) and 2 (Carrying and Using a Destructive Device During and in Relation to Crimes of Violence); 26 U.S.C. §§ 5845(a) and 5861(d) and 18 U.S.C. § 2 (Possession of an unregistered destructive device) has been committed by Michael Hari, Michael J. McWhorter, Joe Morris, Ellis Mack, and Wesley Johnson.

4.      I seek authorization to search Facebook's information associated with **Joe Morris** who is using Facebook user identification number (UID) **100013800840367** and Facebook name "**Joe Morris**" hereinafter the "target account."

## DETAILS OF THE INVESTIGATION

5.      On August 5, 2017, at approximately 5:00 a.m., an explosive device was thrown through the window of the Dar Al Farooq Islamic Center (DAF), located at 8201 Park Avenue South, Bloomington, in the District of Minnesota. The device exploded while five individuals were inside the building; although no one was injured, the explosion caused extensive damage to DAF. After the explosion, FBI Minneapolis interviewed a witness who was present during the explosion. The witness stated he left the DAF after prayer, and while walking to his vehicle, heard glass breaking. The witness looked toward the noise and saw a man run from DAF to a dark-colored truck. The witness saw the truck quickly leave the parking lot. FBI Minneapolis collected video from DAF of the parking lot, which showed a dark truck leaving the parking lot of DAF just before the explosion.

6.      On November 7, 2017, at approximately 7:30 a.m., a secretary at the Women's Health Practice (hereinafter, the "Clinic") entered the Clinic located at 2125 S. Neil St., Champaign, in the Central District of Illinois. She found a broken window, glass on the floor, and an explosive device inside a surgical room with oxygen tanks. The Clinic offers medical services for women, including abortions.

7.      She contacted law enforcement authorities, and multiple agencies went to the Clinic, including the FBI, University of Illinois Police Department (UIPD), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the Champaign Police Department. Agents rendered the explosive device safe. The device consisted of a segment of PVC pipe with a plastic cap on one end and duct tape over the other end.

3

The pipe contained a magnesium strip and a powder determined to contain thermite, a pyrotechnic compound. These factors led a bomb technician to conclude that the device was designed to burn.

8.    Around December of 2017, a confidential source (CS1) told the FBI that Michael B. Hari ("HARI") has guns and bomb-making material inside HARI's parents' home in Paxton, Illinois.[1]

9.    On January 27, 2018, a second confidential source (CS2)[2] provided information that three individuals - HARI, Michael McWhorter ("MCWHORTER"), and Joe Morris ("MORRIS") – were responsible for the bombing carried out at the DAF Mosque, in Bloomington, Minnesota, and the attempted bombing at the Women's Health Practice in Champaign, Illinois. CS2 said CS2 obtained this information because CS2 had worked for HARI, who recruited CS2 into a militia group known as the "White Rabbits" that was led by HARI.

10.    On or about January 27, 2018, CS2 saw illegal fully automatic firearms, M4s, video jammers, and tannerite, which the militia group locked in a safe inside HARI's office in Clarence, Illinois. CS2 also said that one night when CS2 was drinking with MORRIS and MCWHORTER, MORRIS admitted throwing a black powder pipe

---

[1] CS1 has no criminal history. CS1's stated motivation for providing the information was that CS1 did not want anyone to get hurt. The FBI has paid CS1 approximately $1,000 to date for the information provided.

[2] CS2 has a criminal history that includes convictions for possession of drug paraphernalia and cannabis in the late 1990s. In the early 2000s, CS2 was convicted for driving under the influence and misdemeanor assault. CS2 currently has a pending attempted assault charge. The FBI has paid CS2 $1,000 for the information provided.

bomb at a mosque in Minnesota. MORRIS told CS2 that he made the pipe bomb and

that MCWHORTER threw it in the mosque. MORRIS claimed HARI was going to pay

them $18,000 for their participation in the Minnesota bombing. MORRIS later told CS2

that he made and placed the incendiary device at the Clinic in Champaign. MORRIS

complained to CS2 that it did not go off and MORRIS had no idea why. MORRIS told

CS2 that the truck, which was used to get away, was rented in Champaign, possibly at

Enterprise Rent-A-Car.

11.     On February 12, 2018, CS2 gave me permission to take photographs of

CS2's conversations with MORRIS on Facebook. On one occasion, MORRIS requested

CS2 to come to "the office", (known to law enforcement as 100 South Main Rd.,

Clarence, Illinois) for a "mandatory meeting." On another occasion, MORRIS requested

CS2 to come to the office so they could "show you something." According to multiple

cooperating witnesses, the group would usually meet at the office to brief their plan

prior to conducting their criminal activities. CS2 was aware that the target Facebook

account belongs to MORRIS.

12.     On February 13, 2018, CS1 provided pictures of items in the garage at

HARI's parents' home in Paxton, to which HARI has access. Included in the pictures

was a photograph of the Anarchist's Handbook, which includes instructions for the

creation of thermite. The photographs also show tools, such as a drill, that may be used

in the creation of a pipe bomb.

13.     On February 19, 2018, a tip was provided by email to the ATF anonymous
tip-line indicating explosive devices were contained in a suitcase and one gray bag in a
shed at the back of the property located in Clarence, Illinois. The tip stated:

> this is a possible terrorism threat i know a man named [J.O.] he is
> about 30 years old he is always talking about getting the niggers and
> here lately he said he is really going to get them he has been buying a
> lot of wierd chemicals like nail polish remover and battery acide and i
> thought he was making meth because he has science things like
> beakers too but he said no it is for a nigger schredder and he has four
> big black suitcases in his shed and a little greay bag and they are full of
> stuff like pipes and caps and wires nails and he told me to watch the
> news this week he lives at [Address in Clarence, Illinois] his house is a
> brown and yellow trailer and a garage put together and he has a lot of
> sheds but the one with that stuff in it is the red shed with white boards
> that is far in the back of his yard i know his kid and we hang out but i
> am afriad someone will get hurt if someone doesnt do something i also
> sent something about it to the newspaper so if you just blow it off like
> you did that school schooter kid in florida the press will know you got
> a tip so you better check it out just saying you did screw up once and
> he has a rebel flag on a pole in front of his house there is lots of them in
> town but his is the brown and yellow house on the north end of main
> road he also has kids and he just got out of jail [J.O.] and you better
> check it out because i thin it is bomb stuff for sure.

14.     An FBI forensic examiner determined that the IP address from which the
above referenced email originated was a proxy, which is generally intended to ensure
anonymity and make difficult any trace to the true sender.

15.     On the same day, the FBI, UIPD, and Ford County Sheriff's Department,
went to J.O.'s residence in Clarence, Illinois. Agents searched the residence pursuant to
J.O.'s consent and found multiple explosive devices in a shed at the back of J.O.'s

6

residence. J.O. and his wife were very cooperative during the search of the premises.
Both J.O. and his wife said they did not know anything about the devices that were
discovered, and said they believed HARI was responsible for placing the devices on his
premises.[3]

16.     One of the devices agents found at J.O.'s residence was a pipe bomb
attached to a small green propane tank. A robot took photographs of the device and
rendered it safe. CS1 said that, in approximately 2008, HARI had possession of multiple
green propane tanks that looked "very similar to the tanks HARI had possession of in
2008."

17.     On February 19, 2018, CS2 took screen shots of a Facebook post by
MCWHORTER with user name "Michael J McWhorter" which stated "Clarence gonna
be on the news again, this shit is crazy man."

18.     On February 27, 2018, FBI agents canvassed Clarence, Illinois, to find any
witnesses who may have knowledge of the devices that were discovered on J.O.'s
property. During the canvass, multiple people were interviewed, including
MCWHORTER's brother (hereafter, "the brother"). The brother said that a few days
earlier, HARI and MORRIS had arrived at his residence in a Ford Taurus and dropped
off a bag. The brother consented to a search of his residence. During the search, agents

---

[3] At that time, HARI faced criminal charges in Ford County for an alleged assault on J.O.
in June 2017. The incident involved a fight where HARI is alleged to have held J.O. down and
pointed an air soft gun to J.O.'s head until police arrived. At that time of the "tip," HARI had a
hearing scheduled on March 13, 2018, with a trial on April 9, 2018.

found four shotguns and four assault rifles inside a camouflage bag. They also found a black hard-gun case, a green plate carrier with soft armor, and a bandoleer containing multiple 12-gauge bullets. The ARs were subsequently sent to the FBI to be tested. The FBI laboratory determined that two of the four ARs were fully automatic and met the definition of a "machinegun," as defined by 18 U.S.C. § 921(a)(23) and 26 U.S.C. § 5845(b).

19.     Agents asked the brother why HARI and MORRIS brought the guns to his house. The brother answered that HARI told him, "the police will want to come talk to me, can I keep them here until I speak to them?" MORRIS told the brother that HARI did not want to have the guns when the police come to speak to him. The brother said he placed the shotguns in the case when HARI and MORRIS arrived, and admitted his DNA would be on the shotguns. The brother thought HARI and MORRIS dropped the weapons off on February 20, 2018, between 2:30 p.m. to 3:30 p.m., "before the kids got off school." MORRIS carried all the weapons up the stairs.

20.     While law enforcement officers were interviewing the brother on his front porch, HARI arrived driving a gray Mazda. HARI identified himself as "Mike Hari." Agents asked HARI if they could help him. HARI said he wanted to speak to the brother. Agents told HARI that they were speaking to the brother and that he could come back when the conversation ended. HARI then asked the brother where "EJ" was. ("EJ" is the nickname of ELLIS MACK who is the stepson of MCWHORTER). The

brother said that MACK was at MCWHORTER's house down the road. HARI looked

into the front door of the brother's residence for a few seconds and then left in the gray

Mazda. I watched HARI drive to MCWHORTER's residence.

21.     The brother also said that, approximately one month earlier, he, HARI,

and MORRIS were at HARI's office in Clarence when HARI asked, "do you want to see

some science stuff?" The brother said HARI poured some fluid in the snow on the

doorstep of the office, then placed a piece of "a braided wire [approximately] one inch

in length, that was flat" inside the fluid. After a few minutes, the metal and fluid began

to glow and eventually ignited for approximately 2-3 minutes. The brother said the

fluid was contained in a "brake fluid bottle" approximately 8-12 inches high.

22.     According to the brother, on another occasion approximately one month

ago, HARI, MORRIS, and he were again at the office when HARI pulled out two

containers from the office. The brother described the containers as "clear" and "about

the size of a coffee can." Both containers were approximately one-third full. One

container had a white powdery substance inside, while the other container had a red

powdery substance inside. The brother did not know what either of the powdery

substances contained. According to the brother, HARI took a scoop of the red powder

and poured it in a burning fire, hoping it would ignite, but nothing happened. When

nothing happened, HARI said, "Oh, that didn't do anything." MORRIS said the

powdery substances should "burn really hot."

9

23.      According to the brother, a couple days after the incident with the powder, he was again at the office with HARI and MORRIS. The brother said he saw HARI and MORRIS cleaning some of the same weapons that were taken from his house by law enforcement on February 27, 2018. When the brother saw the weapons, he said "those look neat." HARI responded, "Don't tell anyone I don't want a lot of people knowing I have them." HARI said, "They are lightly modified, two are semi-auto and one is fully auto."

24.      On February 28, 2018, I interviewed MCWHORTER's wife and her minor daughter (hereafter, "the wife" and "the daughter"). At the time, the wife said her last communication with MCWHORTER was on February 27, 2018, when MCWHORTER called from MACK's phone. The wife said she told MCWHORTER that the FBI only wanted to talk to him and asked MCWHORTER where he was. MCWHORTER replied, "I can't tell you, I love you" and then ended the call.

25.      The daughter said that on February 27, 2018, during the consent search of MCWHORTER's brother's house, she was at home. She said HARI was also at the house and that he was on the phone with MCWHORTER for approximately 2-3 minutes. HARI told the daughter, "If the FBI wants to talk to you, tell them you want to talk to a lawyer." HARI then stated, "I will wait here to find out what is going on down the road," referring to the search at the brother's house. The daughter also said HARI kept going in and out of the house. She said HARI eventually pushed MACK out the door saying, "Let's go for a ride." The daughter believed HARI appeared to be in a rush and that MACK appeared as though he did not want to go.

26.     On March 10, 2018, I interviewed MCWHORTER. MCWHORTER initially denied having any knowledge of any type of explosive or incendiary type of devices. MCWHORTER said he was aware of four shotguns and four assault rifles that belonged to HARI. MCWHORTER described one of the assault rifles as "really small" and said three rifles had aluminum lowers. MCWHORTER also said three of the rifles were illegal; two were "full auto" and two were "way too damn short." MCWHORTER said the rifles belonged to HARI and that HARI bought all the pieces to build the assault rifles. MCWHORTER said he assisted in drilling an AR to enable it to shoot fully automatic. HARI instructed MCWHORTER on how to make the alterations. The ARs were drilled at HARI's parents' house in the garage. HARI, MORRIS, MCWHORTER, and MACK knew the weapons were fully automatic because they all fired the weapons outside of Paxton. According to MCWHORTER, the weapons had been stored in a vault in HARI's office in Clarence. MCWHORTER said law enforcement would find his fingerprints on the ARs. MCWHORTER admitted to bringing the ARs and shotguns to the brother's house in a camouflage bag and a black plastic case. MCWHORTER's description of the bags and weapons matched the description of what law enforcement officers seized from the brother's house on February 27, 2018.

27.     MCWHORTER admitted to his participation in the attempted bombing of the Clinic in Champaign on November 7, 2017. MCWHORTER said HARI, MORRIS, JOHNSON, and MCWHORTER were in a gray Dodge Ram 2500, which HARI rented at Enterprise Rent-A-Car in Champaign. (Records obtained from Enterprise confirmed

that HARI had rented a grey Dodge Ram during the time the pipe device was thrown into the window of the Clinic.) MCWHORTER said the thermite device was made in Clarence before the attempted bombing. MCWHORTER said HARI made the device out of a white PVC pipe. MCWHORTER said MORRIS was dropped off "in the middle of the night"; that MORRIS smashed the window and threw the device in the window at the practice; and that they picked MORRIS up north of the practice. MCWHORTER said they would sometimes use a magnesium strip to set off a thermite device. According to MCWHORTER, the magnesium strip sets off the thermite device a lot faster "than a normal wick would." He said the magnesium strip looks like tape, but it is metal, "blackish grey in color."

28.     MCWHORTER also admitted to his participation in the bombing of DAF on August 5, 2017. MCWHORTER said MCWHORTER, HARI, and MORRIS drove to Minnesota in a charcoal gray Nissan Frontier, which HARI rented from Enterprise Rent-A-Car in Champaign. According to MCWHORTER, HARI picked up MORRIS and MCWHORTER from their homes prior to departing Illinois. HARI, MCWHORTER, and MORRIS each had specific roles for the bombing. HARI was the driver, MORRIS was responsible for smashing the window in, and MCWHORTER was responsible for throwing the bomb in the window. MCWHORTER claimed it was HARI's idea to target DAF. MCWHORTER said they did not intend to kill anyone, but they wanted to "scare them out of the country" (referring to Muslims), because they push their beliefs on everyone else. MCWHORTER also said they committed the bombing mainly to "show

them hey, you're not welcome here, get the fuck out." MCWHORTER said MORRIS

smashed the window in with a sledgehammer. MCWHORTER described the device as

a "huge ass black powder bomb." The device was approximately 18"-24" tall.

MCWHORTER initially said it was made out of PVC, but then stated it was probably

metal. MCWHORTER admitted igniting the device with a green fuse. MCWHORTER

said he didn't want to be anywhere near it when it went off. MCWHORTER said after

he threw the bomb inside he saw a man, who looked "directly at him." MCWHORTER

said this occurred at approximately 3:00 a.m. to 4:00 a.m. MCWHORTER said, "we were

long gone before it went off" (referring to the bomb exploding).

29.     MCWHORTER also admitted that he, HARI, MORRIS, MACK, and

JOHNSON participated in a home invasion in Indiana. MCWHORTER was unsure of

the exact date but it was after December 2017. MCWHORTER stated that the group

believed the home was of a Hispanic drug dealer that could be robbed of the cash

inside. He said the group was armed with the automatic weapons and posed as police

officers executing a search warrant. MCWHORTER stated they did not find any cash in

the residence. In addition, MCWHORTER also admitted the group had attempted to

rob three Wal-Marts in Illinois.

30.     HARI, MORRIS, MCWHORTER, and MACK were arrested on March 13,

2018. MCWHORTER was again interviewed after he waived his rights pursuant to

Miranda. At that time, he further told agents that HARI talked about "higher ups" and

identified two people HARI identified as "Ben Lewis" and "Congo Joe." MCWHORTER

said that, although HARI had cellphones, HARI either had people call him back, or

when HARI dialed, he seemed to add extra digits to get through to someone.

MCWHORTER stated that HARI has a Proton email account that masks the IP address

he uses.

31.     Additionally, MCWHORTER described a "mission" whereby HARI,

MORRIS, and MCWHORTER traveled to near Effingham in the Southern District of

Illinois to attempt to damage railroad tracks by use of an incendiary device.

MCWHORTER placed jumper cables on the tracks near a crossing to cause the crossing

gate to malfunction. HARI then used an incendiary device to damage the tracks. In

connection with this sabotage, MCWHORTER believed that HARI sent a message to the

owner of the railroad tracks through the illinoispatriot@protonmail.com account

demanding the payment of a substantial sum of money to prevent additional sabotage

in the future. The FBI has confirmed that this railroad track damage occurred and that

an extortion demand was sent via electronic mail to the owner of the railroad.

32.     On March 28, 2018, and April 19, 2018, agents interviewed MORRIS in the

presence of his defense counsel pursuant to a cooperation agreement with the United

States. The agreement conferred conditional direct use immunity on MORRIS's

statements made pursuant to the agreement, but also informed MORRIS that the United

States would be free to make indirect, or derivative, use of his statements. During the

interviews, MORRIS admitted to his participation in the bombing of the DAF on

August 5, 2017, in Bloomington, Minnesota, the Women's Health Practice attack on

November 7, 2017; the Walmart robbery in Watseka, Illinois, on December 4, 2017; the Ambia, Indiana, home invasion on December 16, 2017; the Walmart robbery in Mt. Vernon, Illinois, on December 17, 2017; the Canadian National Railroad attack near Effingham, Illinois, on January 17, 2018; and admitted to assisting HARI place the explosive devices on JO's property on February 19, 2018. Additionally, MORRIS said the group was trying to raise approximately $800,000 to $1,000,000 to kick off the revolution. One of the items they planned on purchasing with the money was an Armored Personnel Carrier (APC).

33.     On January 17, 2019, an open source review on the target account revealed a picture posted on September 29, 2017, which depicted what appeared to be HARI in the driver seat of the vehicle surveilling a military installation with an Armored Personnel Carrier (APC) behind a chain link fence. The open source review also revealed that on November 21, 2017, the target account had a post which read "If anyone needs to get ahold of me inbox me threw messenger my phone is off rite now it might take a couple hrs to get back." Based on my training and experience, I know criminals use private messaging features like Facebook messenger to coordinate their criminal activities in order to avoid law enforcement detection.

34.     Furthermore, a federal Grand Jury in the Central District of Illinois indicted HARI, MCWHORTER, and MORRIS for violations of 18 U.S.C. §§ 1951 and 2 (Conspiracy to Interfere with Commerce by Threats and Violence); 18 U.S.C. § 922(o) and 924(a)(2) (Unlawful Possession of a Machine Gun); 18 U.S.C. §§ 844(i) and 2

(Attempted Arson); and 18 U.S.C. § 922(g)(1) (Possession of a Firearm by a Felon).

Furthermore, a Federal Grand Jury in the District of Minnesota has indicted HARI,

MCWHORTER, and MORRIS for violations of 18 U.S.C. §§ 247(a) (1) and 2

(Intentionally Defacing, Damaging and Destroying any Religious Real Property Because

of the Religious Character of that Property); 18 U.S.C. §§ 247(a)(2) and 2 (Intentionally

Obstructing, and Attempting to Obstruct, by Force and the Threat of Force, the Free

Exercise of Religious Beliefs); 18 U.S.C. §§ 844(h) and 844(m), (Conspiracy to Commit

Federal Felonies by Means of Fire and Explosives); 18 U.S.C. §§ 924(c)(1)(B)(2) and 2

(Carrying and Using a Destructive Device During and in Relation to Crimes of

Violence); 26 U.S.C. §§ 5845(a) and 5861(d); and 18 U.S.C. § 2 (Possession of an

unregistered destructive device).

35.     Based on my training and experience, I know criminals regularly post

comments, images, and other information regarding their criminal activity on Facebook.

Criminals will also regularly communicate with their co-conspirators using Facebook. I

believe there is probable cause to believe that information regarding the

aforementioned criminal activities will be found on the Facebook page used by

**MORRIS.**

36.     Facebook owns and operates a free-access social networking website of

the same name that can be accessed at http://www.facebook.com. Facebook allows its

users to establish accounts with Facebook, and users can then use their accounts to

share written news, photographs, videos, and other information with other Facebook

users, and sometimes with the general public.

37.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

38.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

39.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook

17

accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

40.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

41.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

42.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

43.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

44.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

45.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

46.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding

19

someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

47.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

48.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

49.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

50.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

51.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall

postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

52.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

53.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

21

54.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and

timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

55.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

56.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

57.     Based on the forgoing, I request that the Court issue the proposed search warrant.

58.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States in the Central District of Illinois that has jurisdiction over the offense being investigated." Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Further, Affiant sayeth not.

s/Joel Smith

JOEL C. SMITH, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this _23 d_ day of _April_, 2019.

s/Eric Long

ERIC I. LONG
United States Magistrate Judge

24

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the following Facebook Account(s):

| NAME | FACEBOOK IDENTIFICATION (UID) | FACEBOOK NAME |
|------|------|------|
| Joe Morris | 100013800840367 | Joe Morris |

including information that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company headquartered in Menlo Park, California.

25

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)      All contact and personal identifying information, including for user "Joe Morris" with user ID **100013800840367:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **July 1, 2017 to March 15, 2018;**

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)      All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user from **July 1, 2017, to March 15, 2018**, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account from **July 1, 2017, to March 15, 2018**;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government on or before **February 28, 2019.**

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1951 and 2 (Conspiracy to Interfere with Commerce by Threats and Violence); 18 U.S.C. §§ 922(o) and 924(a)(2) (Unlawful Possession of a Machine Gun); 18 U.S.C. §§ 844(i) and 2 (Attempted Arson); 18 U.S.C. § 922(g)(1) (Possession of a Firearm by a Felon); 18 U.S.C. §§ 247(a) (1) and 2 (Intentionally Defacing, Damaging and Destroying any Religious Real Property Because of the Religious Character of that Property); 18 U.S.C. §§ 247(a)(2) and 2 (Intentionally Obstructing, and Attempting to Obstruct, by Force and the Threat of Force, the Free Exercise of Religious Beliefs); 18 U.S.C. §§ 844(h) and 844(m) (Conspiracy to Commit Federal Felonies by Means of Fire and Explosives); 18 U.S.C. §§ 924(c)(1)(B)(2) and 2 (Carrying and Using a Destructive Device During and in Relation to Crimes of Violence); 26 U.S.C. §§ 5845(a) and 5861(d) and 18 U.S.C. § 2 (Possession of an unregistered destructive device) involving Joe Morris from July 1, 2017, including, for each user ID identified on Attachment A, information pertaining to the following matters:

>   (a) Communications between known subjects. Communications of between known subjects and unknown subjects. Pictures of clothing and firearms used during captioned investigation. Preparatory steps taken in furtherance of the robbery.

>   (b) Communications related to photos/attachments. Communications related to travel. Communications related to dates.

(c) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(d) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(e) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(f) The identity of the person(s) who communicated with the user ID **100013800840367** regarding matters relating to the aforementioned violations of the United States Code.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Facebook. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.       such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____        _____
Date                           Signature